THE PEOPLE ex rel. CORNELL UNIVERSITY, Appellant, *v.* IRA DAVENPORT, Comptroller, etc., Respondent.

The purpose of the act of congress of 1862 (Chap. 130, U. S. Laws of 1862) donating public lands to the states " which may provide colleges for the benefit of agriculture and the mechanic arts," was to provide a fund from the sale of the public lands or the land scrip, of which the state should be the trustee and the safety of which should be guaranteed by it; the whole interest of the principal fund to be used for the purposes mentioned without deduction of any costs, charges or expenses of any kind, so that " the entire proceeds shall be applied without any diminution whatever " to said purposes.

When this state, by the act of 1863 (Chap. 460, Laws of 1863), accepted the donation it assented to the terms and conditions imposed by congress and obligated itself to comply therewith, and by the terms of said act expressly assumed the obligation.

The state, however, did not guarantee and is not obligated to pay interest at the rate specified in the act of congress (five per cent), if it is unable to obtain investments of the character named yielding that amount ; it simply is required to pay over what it receives, undiminished by any charges for premiums or commissions paid in procuring investments.

The legislature having by the charter of Cornell University (Chap. 585, Laws of 1865), provided a college for the purposes specified in the .act of congress and appropriated to it the income of the land scrip fund, it became and is the sole beneficiary of the trust, and as such is entitled to the benefits derivable therefrom.

While the comptroller is justified in refusing to issue his warrant for any payments out of the income, save as authorized by the statutes of the state, even though the state has failed to comply with the terms and conditions of the congressional enactment, and while the courts in deciding a case where the power and duty of the comptroller are in question are to be guided by the state statutes, yet in construing a statute making an appropriation the said act of congress and the act of the State legislature accepting the trust are to be considered.

Accordingly *held,* that the term " revenue" in statutes of the state (Chap.

550 PEOPLE ex rel. CORNELL UNIV. *v.* DAVENPORT. [Dec.,

Statement of case.

185, Laws of 1881; chap. 270, Laws of 1882) making appropriations to said university from the "revenue" of the land scrip fund, included all the revenue received from bonds purchased for an investment of the funds, without diminution by reason of expenses of investment or premiums paid on such bonds; that the comptroller was bound to issue to the university his warrant on the treasurer for the amount of such revenue, not exceeding, however, the amount appropriated by said statutes, and was not justified in charging against the income the premiums and commissions paid in the purchase of the bonds; and that the university was entitled to a *mandamus* to compel the comptroller to so issue his warrant.

But *held,* that the warrant could not be required for any greater sum than that actually paid into the treasury arising from the revenues of the trust fund and for which an appropriation had been made.

*It seems* it is the duty of the state to make the appropriation necessary to pay the premium upon the bonds, and so keep the principal of the trust fund intact.

*In re McGraw* (111 N. Y. 66) distinguished.

*People ex rel. Cornell University* v. *Davenport* (30 Hun, 177) modified.

(Argued December 16, 1889; decided January 14, 1890.)

APPEAL from order of the General Term of the Supreme Court in the third judicial department, made July 2, 1883, reversing an order of Special Term, denying a motion of the relator herein for a *mandamus* and directing the issuing of a *mandamus* as hereinafter specified.

This was a case agreed upon in a controversy submitted without action. In such submission the following are the material facts: On the 2d day of July, 1862, the United States Congress passed an act donating public lands to the several states and territories which might provide colleges for the benefit of agriculture and the mechanic arts. By such act an amount of public land was apportioned to each state, equal to thirty thousand acres for each senator and representative in congress to which the state might be entitled, and this land was apportioned, as was stated in the act, for the benefit of agriculture and the mechanic arts. This land was to be sold by the state receiving it, and the moneys which were received as the purchase-price of such sale were to be invested by the state in stocks of the United States, or of this state, or in some other safe stocks yielding not less than five per cent per annum upon the par value of said stock, and the moneys so

invested were to constitute a perpetual fund the capital of which was to remain forever undiminished, and the interest of which was to be by the terms of the act inviolably appropriated to the endowment, support and maintenance of at least one college where the leading object should be to teach such branches of learning as relate to agriculture and the mechanic arts, in such manner as the legislatures of the states might respectively prescribe, in order to promote the liberal and practical education of the industrial classes in the several pursuits and professions in life.

By the third section of the act it was enacted that all the expenses of management superintendence, and taxes from the date of selection of said lands previous to sale, and all expenses incurred in the management and disbursements of the moneys which might be received therefrom, shall be paid by the states to which the lands belonged out of the treasury of such states, " so that the entire proceeds of the sale of said lands shall be applied without any diminution whatever to the purposes hereinafter mentioned."

The grant of the land by the congress, under the act above mentioned, was in and by section five of such act, made on the conditions stated therein, and it provided that "the previous assent of the several states shall be signified by legislative acts." Among those conditions was one which provided that if any portion of the fund invested, or any portion of the interest thereon, should by any action or contingency be diminished or lost, it should be replaced by the state to which it belonged, so that the capital of the fund should remain forever undiminished; and the annual interest should be regularly applied, without diminution to the purposes mentioned in the act. It was also provided that no state should be entitled to the benefits of the act, unless it should express its acceptance thereof by its legislature within two years from the date of its approval by the president.

On the 3d of May, 1863, the legislature of the state of New York passed an act (Chap. 460, Laws of 1863), entitled "An act relative to the lands granted to this state by the act of

congress, entitled "An act donating public lands to the several states and territories which might provide colleges for the benefit of agriculture and the mechanic arts,' approved July, 1862, and the sale thereof, and the investment of the proceeds of such sales." By section one of this act the comptroller of the state was authorized to receive from the authorities of the United States the land scrip to be issued for the lands granted to the state by the act of congress above mentioned, and the comptroller was to give all necessary receipts and acknowledgments for the scrip which might be so received by him. By the second section the comptroller was authorized, with the approval of the officers ' named therein, from time to time, as he might deem proper, to sell the said land scrip, or any part thereof, for cash, or for stocks of the United States, or of the states, or some other safe stocks, yielding not less than five per cent upon the par value of said stocks, and to execute all necessary and proper transfers thereof.

By section three of the act the treasurer was authorized to pay on the warrant of the comptroller,.out of any moneys in the treasury not otherwise appropriated, all the expenses of management and superintendence, and taxes, if any, from the selection of said lands previously to their sale; and also all expenses incurred in the management and disbursement of the moneys which might be received therefrom, and of all incidental matters connected with or arising out of the care, management and sale of the said lands; so that the entire proceeds of the sale of said lands should be applied, without any diminution whatever, to the purposes mentioned in the said act of congress.

Provision was made by the fourth section for investing the moneys which might be received on the sale of the said lands or land scrip, in stocks of the United States or of this state, or in some other safe stocks yielding not less than five per centum per annum on the par value of said stocks; and the money so invested was to constitute a perpetual fund, the capital of which should remain forever undiminished, except as provided for in and by the said act of congress.

Subsequent to the passage of this state statute, and on the 27th day of April, 1865, the legislature passed an act to establish the Cornell University, and to appropriate to it the income of the sale of public lands granted to this state by congress on the 2d day of July, 1862; also to restrict the operation of chapter 511 of the Laws of 1863.

By the sixth section of such act it was provided that the income, revenue and avails which should be received from the investments of the proceeds of the sale of the lands, or the scrip therefor, or any part thereof, granted to this state by the act of congress (above mentioned), were thereby appropriated to and should, from time to time, as the same might be received, be paid over to the trustees of the Cornell University, for its use and behoof, in the mode and for the purposes defined in said act of congress.

By the tenth section of the act all payments made under the act out of the treasury of the state were to be made by the treasurer on the warrant of the comptroller out of the special fund on deposit with the treasurer arising from the receipt of the income and revenue and avails of the proceeds of the sales of the lands or of the scrip already mentioned.

The university, thus incorporated, and to which the avails of the sales of the lands and scrip above mentioned were to be paid, was also, in and by the ninth section of the act, compelled to annually receive students, one from each assembly district of the state, to be selected as provided in the act, and was to give them instruction in any or in all the prescribed branches of study, in any department of said institution, free of any tuition fee or any incidental charges to be paid to said university.

By virtue of the acts above mentioned, and by compliance with the terms and conditions named therein, the relator, the Cornell University, became, and ever since has been, and now is, sole beneficiary of the trust created by the act of congress and the act of the state accepting the same, and, as such, is entitled to the benefits derivable therefrom. In 1881 the principal

of the trust fund above mentioned became settled and fixed at $473,402.87, and is designated and known as the college. land scrip fund. In that year, and by chapter 185 of the laws of that session, the legislature appropriated $25,000 to Cornell University, payable from the college land scrip fund; the language and form of the clause in said act making such appropriation are as follows:

"Payable from the College Land Scrip Fund.
"*Revenue.*
"For the Cornell University, twenty-five thousand dollars."

And in 1882, chapter 270, there was appropriated as follows:

"Payable from the Land Scrip Fund.
"*Revenue.*
"For the Cornell University, twenty-five thousand dollars."

The following is a correct statement in regard to the college land scrip fund, and its income or revenue from and including October 1, 1881, to February 10, 1883, as shown by the books and records of the office of the comptroller of the State of New York:

| | | |
|---|---:|---:|
| Principal sum | | $473,402 87 |
| Balance of revenue in the treasury October 1, 1881 | | $3,203 47 |
| Total income during the fiscal year ending Sept. 30, 1882 | | 20,074 27 |
| Total revenue available during fiscal year ending Sept. 30, 1882 | | $23,277 74 |
| There is charged as payment from that fund during that time to Cornell University | $18,700 00 | |
| For premium and interest on U. S. bonds purchased | 721 08 | |
| | | 19,421 08 |
| Leaving a balance of revenue in treasury Oct. 1, 1882 | | $3,856 66 |

The above item of $721.08 for "premium and interest" is made up as follows:

| | |
|---|---:|
| Premiums................................... | $718 61 |
| Interest accrued.... . ..................... | 2 47 |
| | $721 08 |

On the first day of October, 1882, there was to the credit of the principal of the college land scrip fund, the sum of $262,309.12 uninvested, and on the second and tenth days of said month the comptroller purchased $200,000 of United States four per cent bonds, paying therefor out of this fund the sum of $238,394.81, including premiums, interest, and commissions. Of this amount ($238,394.81) $200,000 is charged as a payment out of the principal fund, and the balance, viz., $38,394.81, is charged as a payment out of the revenue account. At the time of making this last charge there was standing to the credit of the revenue account of this fund only the sum of $3,901.66, and after making such charge the revenue account stood on the books of the comptroller as overdrawn to the amount of $34,493.15. Since the purchase of said bonds and the making of the above charge against the revenue account there has been paid in as interest and put to the credit of the revenue account of said fund the sum of $7,280.76; and there has been invested in purchase of three and one-half per cent Albany county bonds $10,000 of principal, at a cost to the revenue account of $116.66 for accrued interest, and $200 for premium, leaving the account at this date, viz., February 10, 1883, still overdrawn to the amount of $27,529.05, and capital uninvested $52,309.12.

The item of $38,394.81 paid in October, 1882, for interest, premiums and commissions, is made up as follows:

| | |
|---|---:|
| Interest accrued ........................... | $131 51 |
| Premiums ................................... | 38,013 30 |
| Commissions ................................ | 250 00 |
| | $38,394 81 |

The comptroller declined to make any further payments to Cornell University from the revenue already received, and declared his intention and future policy to be, not to make any payments to the University from the future income of said trust fund until after the revenue therefrom shall have first made good the revenue account for the drafts made upon it as stated above for interest, premiums and commissions on investments already made.

The investments, and each and all of them, made by the comptroller of said fund were the best investments that could be made by him of the moneys so invested, and the same draw the most revenue obtainable therefrom.

It is claimed on behalf of the relator that it is, in any event, annually entitled to five per cent income on the principal fund, whether the fund actually earns that amount or not, and as much more as the fund actually does earn.

The relief sought is a peremptory *mandamus*, directing the comptroller to draw his warrant on the treasurer for $28,640.29, payable out of the college land scrip fund to the relator, said sum being five per centum upon the whole capital for the two years ending September 30, 1883, less $18,700 paid the relator during the fiscal year ending September 30, 1882.

The Special Term denied a motion for a *mandamus*, and from that order the relator appealed to the General Term. That court modified the order of the Special Term and granted the motion for a *mandamus*, directing the comptroller to deduct from the income received by him a sum made up upon this principle: A certain amount of the annual income was to be retained by the comptroller and placed at interest, so that by the time the principal of the bonds representing the investment became due, there would be in his hands, arising from this sinking fund, a sum sufficient to make that part of the principal sum which had been charged to the revenue account good for the amount that had been taken from it in the payment of the premium upon the bonds pur-

chased by him, the balance of the amount was to be annually paid to the university.

Further facts appear in the opinion.

*S. D. Halliday* for appellant.    This is a special proceeding, the order was final, and hence appealable to the Court of Appeals under subdivision 3 of section 190 of the Code.    (*People* v. *Spicer,* 34 Hun, 584.)    It is proper for the action to proceed still in the name of Davenport, comptroller. (*Manchester* v. *Harrington,* 10 N. Y. 164 ; *People ex rel.* v. *R. & S. L. R. R. Co.,* 76 id. 294 ; *Sweanarton* v. *Hancock,* 29 Hun, 44 ; *Bd. of Excise* v. *Garlinghouse,* 45 N. Y. 294 ; Code of Civ. Pro. §§ 756, 766.)    This application and the rights of the parties are to be determined by the facts as they existed at the time the application was originally made. (*People ex rel.* v. *Contracting Board,* 46 Barb. 254, 261, 262 ; *People ex rel.* v. *Contracting Board,* 33 N. Y. 382 ;    Code of Civ. Pro. § 2090 ; *People* v. *S. L. R. R. Co.,* 76 N. Y. 294.) A writ of *mandamus* will lie to the comptroller to compel him to perform a statutory duty.    (*Fire Dept.* v. *Bacon,* 42 N. Y. 404.)    Both of the appropriations were, at the time of this application, available as against any funds applicable thereto. (State Const. art. 7, § 8 ; 1 R. S. [7th ed.] 463, § 1, subd. 9.) The " revenue " of this fund, under the peculiar language of the act of congress creating the fund and the act of the state accepting it, is its gross income without any diminution or depreciation for any of the expenses of its investment or management.    (2 Perry on Trusts, §§ 2, 6 ;    Act of Congress, July 2, 1862, chap. 130, § 5.)    A state may sustain the character of a trustee.    It has legal capacity to take and execute a trust for every purpose.    (1 Perry on Trusts, §§ 40, 41 ; *McDonough* v. *Murdoch,* 15 How. [U. S.] 367, 415 ; *Mitford* v. *Reynolds,* 1 Phill. 185, 194.)    Congress may grant public lands or property for charitable or educational purposes, or any other purposes beneficial to the public, upon such terms or conditions as that body may choose to insert in the

.grant. (*U. S.* v. *Hall,* 98 U. S. 357, 358 ; *McGee* v. *Mathis,* 4 Wall. 143, 155 ; *Barrings* v. *Dabney,* 19 id. 1 ; *Swan* v. *Lindsey,* 70 Ala. 520.) This state, by an act passed May 5, 1863, duly accepted the grant and gave its assent to the conditions thereof. (*In re McGraw,* 111 N. Y. 114, 115 ; 45 Hun, 374 ; High on Extraordinary Leg. Rem. § 352.) When money has been appropriated for a specific purpose it is not in all cases a sufficient answer to an application for a *mandamus* to compel its payment for that purpose to set up that the money has been wrongfully applied to other purposes. It may be regarded in contemplation of law as still in the treasury. (*People ex rel.* v. *Comptroller,* 77 N. Y. 50 ; *People* v. *Stout,* 23 Barb. 338 ; *Hohl* v. *Town of Westford,* 33 Wis. 324 ; *Campbell* v. *Polk,* 3 Iowa, 467 ; *Lansing* v. *Van Gorder,* 24 Mich. 456 ; *Risley* v. *Smith,* 64 N. Y. 570.) The "revenue" of this fund is a guaranteed income of at least five per cent, and the act of appropriation on which this proceeding is based is broad enough to call for a determination of that question in this proceeding. (*In re McGraw,* 111 N. Y. 114, 115 ; Laws of 1882, chap. 108 ; Laws of 1865, chap. 585, § 9.)

*Charles F. Tabor,* attorney-general, for respondent. In accepting the fund the state assumed no obligation to pay five per cent interest thereon or income therefrom. It only assumed certain duties as trustee, and undertook to execute a trust, subject both to the rules of law governing the administration of trusts and the terms upon which it assumed the trust. (Perry on Trusts, § 452.) The rights and interests of the relator in the fund, and the income thereof, are based upon and defined and limited by the various acts of the legislature of this state, respecting such fund and the Cornell University, without reference to the act of congress. (*Nat. Bank* v. *Whitney,* 103 U. S. 99 ; *Nat. Bank* v. *Matthews,* 98 id. 621–628 ; Laws 1865, chap. 585, § 6.) The comptroller's refusal to pay five per cent was clearly in accordance with his duty and the law. (*People ex rel.* v. *Chapin,* 101 N. Y. 682 ; Constitution, art. 7, § 8 ; 1 R. S. 170, § 1, subd. 9.)

Peckham, J.  We agree with the learned General Term that in deciding this case we are to be guided by the statutes of our own state, and if, under these statutes, the comptroller was not authorized to make the payment, as demanded by the relator, he was justified in his refusal, even though the state had failed to comply with the terms and conditions of the act of congress donating the land to it.  That would be a matter between the federal government and the state which the comptroller would have no right to decide for himself.  The view taken by the learned judge who wrote the opinion at the General Term would, we think, apply with great force to the ordinary case, as between tenant for life and remainderman, of a fund to be invested in the ordinary way of trust funds.  Such is the case assumed by him, and such are the principles laid down in *Farwell* v. *Tweddle* (10 Abb. N. C. 94).

In construing the meaning of the word "revenue," as used in the appropriation acts of 1881 and 1882, already quoted, other facts than the mere appropriation of money may be regarded; and it is proper not only to look at the previous state statutes, passed upon the subject of the land grant of congress, and its acceptance by legislative action, but also to carefully read the act of congress donating the land, as that act is the foundation upon which all our state statutes upon the subject are based.  This may be done for the purpose of determining what was the true intent of the legislature when it appropriated these sums from the "revenues" of the trust fund.

The clear purpose of the act of congress cannot be mistaken.  It was to provide a fund from the sale of the public lands or of the land scrip, of which the state should be the trustee and the safety of which should be guaranteed by it; and the whole interest of the principal sum was to be used for the purposes mentioned in the act, without the deduction of any costs, charges, or expenses of any name or nature.  The whole actual earning of the fund was to be used for this purpose, and all expenses of management or disbursements were

to be paid by the state which received the donation, so that, in the language of the federal legislature, "the entire proceeds of the sale of said lands shall be applied without any diminution whatever to the purposes" thereinafter mentioned. With this legislation of congress thus plainly set forth in the act of donation, the state, by accepting the donation by legislative act, took upon itself to comply, and it has assented to the terms and conditions of the act upon which the donation was made. In the first act of the legislature upon this subject it provided that the treasurer, on the warrant of the comptroller, should from time to time pay, out of any moneys in the treasury not otherwise appropriated, all the expenses of management, and superintendence, and taxes, if any, from the selection of said lands previous to their sale; and all expenses incurred in the *management and disbursement* of the moneys which might be received therefrom, and of all incidental matters connected with or arising out of the care, management and sale of the said lands; so that the entire *proceeds* of the sale of said lands should be applied, without *any diminution whatever*, to the purposes mentioned in said act of congress."

This language is plain, and it shows the legislative intent to fully comply with the conditions contained in the act of congress. It only required subsequent appropriations to pay over the entire proceeds of the trust fund to the beneficiary, and in this way the purpose of the federal act and of this state statute, would be fully carried out. In the same act 'the legislature also provided for the investment by the comptroller of these trust funds in stocks of the United States, or of this state, or in some other safe stocks, yielding not less than five per cent of the par value of said stocks, and the moneys so invested were declared to constitute a perpetual fund, the capital of which should remain forever undiminished, except as provided for in and by said act of congress.

And in the act incorporating Cornell University the statute provided for the payment to the university of all the income, revenue and avails received from the investment of the pro-

ceeds of the sale of the lands or of the scrip therefor, or for any part thereof, granted to the state by the act of congress above mentioned.

Bearing in mind the relations between the federal and state governments upon the subject of this land grant, and that Cornell University has received the benefits of the trust fund on the conditions heretofore mentioned, we are in a position to inquire intelligently what was meant by the legislature when it used the language it did in appropriating moneys for the university in the years 1881 and 1882. In each of those years the legislature appropriated $25,000 to the Cornell University, and in making such appropriations it used this language : " Payable from the college land scrip fund, revenue, for the Cornell University, $25,000." What did it mean by the use of such language ? Did it mean that the revenues of the trust fund were only such revenues as remained after the payment from them of those very expenses, which, by the terms of the act of congress, and by its own legislative act in accepting the land grant, the state was itself bound to pay, or did it mean that in accordance with both the act of congress and its own plain legislation upon that subject, theretofore adopted and passed, the term "revenue" included all the revenue arising from the bonds purchased, without diminution or subtraction by reason of expenses for investment or premiums paid on such bonds, and that all such interest should, in good faith, be paid by it to this university which it had established and which was to receive the benefits accruing by reason of this act of congress ? We think plainly it meant the latter. The state had not only received the lands and had thus become possessed of this trust fund upon the conditions already mentioned, and by its legislation had accepted such conditions, but in its act creating this university, and as a part consideration for its donation to it of the interest on this fund, it had required that the university should annually receive one hundred and twenty-eight students, that is one from each assembly district, who should be gratuitously instructed by it in any or

in all the prescribed branches of study in any department of said institution. Thus, at the end of four years, and from that time on, there would be, if all the places were filled, five hundred and twelve students availing themselves of gratuitous instruction from this institution. That certainly is a large item and must necessarily be a heavy burden to be borne by it, and it was undoubtedly placed upon it by the state because of the fact that the university was to receive the revenue arising from the large sum above referred to, free and clear of all expense in relation to it. The effect of the opposite construction is stated in the language of the case when it says that, if this action of the comptroller is justified, Cornell University will be deprived wholly of the income from this fund for nearly two years. In our opinion the comptroller was not justified in charging upon his books the sum of thirty-eight thousand and odd dollars against the income for the purpose of taking for the state such income as might accrue in the future until it amounted to that sum. Whatever amount was necessary then, or may be necessary hereafter to expend in the way of premiums for investments for this fund, comes within the plain meaning of the acts of this state already referred to, and such amounts are expenses connected with the management and maintenance of the fund, which should be made good by the state by an appropriation from its treasury. In this way the principal is kept intact, and the whole income is payable to the university, and it is the only way in which it can be done. Although the comptroller was not justified in charging this amount to the revenue account, yet still this court cannot grant relief in the way of a *mandamus* for any greater sum than is actually in the treasury, and which arises from the revenues of that trust fund, and for which an appropriation has been made. The comptroller purchased $200,000 of bonds, upon which he receives interest, and he paid a large premium for them. Whether he charges that premium to the principal or to the income has no effect whatever upon the fact that he receives as interest upon that particular investment but $8,000. The whole of that amount is revenue within the

meaning of that word as used in these statutes, having refer-
ence to all the circumstances already set forth. We, there-
fore, differ with the General Term so far as to say that the
whole of the interest received should be paid by the comp-
troller under the language used in these appropriations up to
the amount in each year actually appropriated, and no part of
it should be set apart for the purpose of making good the
charge of the comptroller against the income of the fund. It is
the plain duty of the state to itself make the appropriation
necessary to pay the premium upon bonds purchased, and to
thus keep the principal of the trust fund entirely and abso-
lutely intact, and to appropriate to the university every dollar
of income. But, if it did not perform its duty, this court can-
not compel the comptroller to pay out any funds for which
the appropriation has not been actually made, nor can it
compel him to pay to the university any greater sum than he
has actually received as interest from the bonds which he pur-
chased, or the other investments in which the trust fund
remains. We agree with the General Term that the comp-
troller could not pay under the language of these appropria-
tions any greater sum than he actually received as interest,
and we do not think that the state is liable to pay any greater
sum than it was enabled to receive by reason of its investment
of its trust fund in safe stocks, as mentioned in the act of
congress and in the statutes of our own state.

In preparing the opinion in the *McGraw Case* (111 N. Y.
66), reference was incidentally made to the duties of the state
in connection with the trust fund. The subject arose while dis-
cussing the claim of the university that all the moneys arising
from the Cornell contract of 1866, therein referred to, formed
part of the trust fund which belonged to the state, the interest
of which was to be paid to the university. It was then stated
that such a claim, if well founded, cast a great responsibility upon
the state, and the requirements of the statute were then sub-
stantially recited as to the investment and payment of interest.
The language of the opinion cannot be said to adjudge the
point that the state was to guarantee the payment of the five

per cent interest, as the guaranty had reference to the principal sum, which was to be kept intact, while the interest on an investment was assumed to be at the rate of five per cent, and it was all to be paid to the university without any deduction.

But there was no question of this nature before the court in that case and none such was decided. The state could not obtain at par bonds of the character described in these acts, paying interest at the rate of five per cent, and we do not think, in view of the language both of the act of congress and of the statutes of the state, that the latter is liable, at all events, to insure to the university five per cent upon the amount of the trust fund, irrespective of the rate which it is enabled to receive by investing the fund in bonds of the character named in the legislation, both state and national, upon the subject.

We, therefore, modify the order of the General Term and direct the comptroller to issue his warrant for the payment to the university of all the interest from the investment remaining in his hands up to the amount of the $25,000 appropriated in each year respectively. If the amount is not agreed upon the order can be settled on notice.

All concur, except FINCH, J., not sitting.

Judgment accordingly.